# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES ENTREKIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:05-0952** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.[1] Docket Entry No. 16. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 21.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

---

[1] Plaintiff has also filed a separate "Motion for Remand for Consideration of New Medical Evidence" that will be discussed herein. Docket Entry No. 18.

1

## I. INTRODUCTION

Plaintiff filed his applications for DIB and SSI on August 19, 2002, alleging that he had been disabled since December 10, 1999, due to "nerve damage to ulnar nerves on both upper extremities" and degenerative disk disease in the upper back and neck.[2]  Docket Entry No. 11, Attachment ("TR"), TR 58, 83, 299.  Plaintiff's applications were denied both initially (TR 33-34, 309-310) and upon reconsideration (TR 35-36, 311-312).  Plaintiff subsequently requested (TR 47) and received (TR 23-26) a hearing.  Plaintiff's hearing was conducted on December 22, 2004, by Administrative Law Judge ("ALJ") Peter C. Edison.  TR 11, 319.  Plaintiff, witness Charles Barrett, and vocational expert ("VE") Dr. Gordon Doss, appeared and testified. TR 319-320.

On March 30, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 9-21.  Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through June 30, 2004.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b)

---

[2] The application for DIB has a filing date of August 18, 2002, but Plaintiff's signature on the application is dated August 19, 2002. TR 58-60. The application for SSI has both the filing date and the date of Plaintiff's signature as August 19, 2002. TR 299-301. Plaintiff had original applications for both DIB and SSI with filing dates of August 4, 2002 that listed an onset date beginning a year later than that on the second applications. TR 61-63, 302-304.

2

and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. The claimant has the following residual functional capacity: The claimant can lift and carry twenty pounds occasionally and ten pounds frequently. He can stand or walk for six hours per eight-hour workday and can sit for six hours per workday. He is also unable to perform repetitive lifting, gripping or grasping with his left hand.

8. The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

10. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

11. The claimant has no transferable skills from any past relevant work and transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such

> jobs include work as counter clerk, entry level security guard, mail clerk, parking lot attendant, order filler and receptionist. There are 1047, 1380, 1594, 446, 4516 and 1698 of these jobs in the Tennessee economy, respectively.
>
> 14.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 414.1520(f) and 416.920(f)).

TR 20-21.

On May 30, 2005, Plaintiff timely filed a request for review of the hearing decision. TR 317-318. On August 29, 2005, the Appeals Council issued a letter declining to review the case (TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to "nerve damage to ulnar nerves on both upper extremities" and degenerative disk disease in the upper back and neck. TR 83.

On November 6, 1992, Plaintiff visited Dr. Wayne Wells with complaints of "recurring" upper back problems. TR 286. Plaintiff recalled an incident of whiplash in 1975, stated that "back spasms" occurred "without provocation," and described them as a "dull pain worse between shoulder blades, radiat[ing] to upper back." *Id.* Dr. Wells recommended applying localized heat and getting bed rest, and prescribed medication.[3] *Id.* On November 9, 1992,

---

[3] The name of the medication is illegible. TR 286.

4

Plaintiff reported to Dr. Wells that his back had improved. *Id.* On December 28, 1992, Plaintiff returned to Dr. Wells complaining of "body ache," congestion in his head and chest, a cough, and "green nasal drainage," and was diagnosed with bronchitis. TR 285. Dr. Wells prescribed Bactrin and Robitussin.[4] *Id.*

On January 12, 1993, Plaintiff reported that "sinus & cough [were] still bothering him," but Dr. Wells noted that his "chest now seems clear." TR 284. On July 6, 1993, Plaintiff reported to Dr. Wells that he had increased stress and a tingling in his elbow that woke him in the middle of the night.[5] TR 284. On July 16, 1993, Dr. Wells noted that the tingling remained in Plaintiff's hand, finger, and shoulders, and that Plaintiff had been missing some work. *Id.* Dr. Wells told Plaintiff to "wait before talking to [Plaintiff's] supervisor." *Id.* On August 2, 2003, Plaintiff's pain remained in both hands and arms, and Dr. Wells prescribed Calan. TR 283. Plaintiff's blood pressure was 156/96 and 132/96 on August 30 and November 30, 1993, respectively. *Id.* Also on November 30, 1993, Dr. Wells diagnosed Plaintiff with osteoarthritis. TR 282. On December 30, 1993, Plaintiff's osteoarthritis was "acting up due to weather." *Id.* Plaintiff also complained of pain in his knees and forearm. *Id.* Dr. Wells prescribed Torodol. *Id.*

On January 25, 1994, Plaintiff visited Dr. Wells complaining of a sore throat and "spitting up blood," and was diagnosed with pharyngitis.[6] TR 282. Dr. Wells diagnosed hypertension on May 31, 1994. TR 281. On July 20, 1994, Plaintiff complained of swelling and pain in his knee as a result of hitting it on lug nuts. TR 280. Dr. Wells noted "slight edema" in

---

[4] A third prescription is illegible. TR 285.

[5] Much of this record is illegible. TR 284.

[6] Most of this record is illegible. TR 282.

5

Plaintiff's right knee, and recommended ice, elevation, ibuprofen, and rest from work. *Id.* On August 19, 1994, Plaintiff returned to Dr. Wells complaining of pain in his arms, back, and shoulders that he blamed on "overuse." *Id.* Dr. Wells diagnosed Plaintiff with a muscle spasm, and recommended medication and heat. *Id.* On August 26, 1994, Plaintiff followed-up with Dr. Wells, reporting that his back pain and swelling remained.[7] TR 279. Dr. Wells noted "mild edema," and diagnosed Plaintiff with multiple muscle spasms. *Id.* On November 14, 1994,[8] Plaintiff's weight was 169 pounds, and his blood pressure was 130/86. *Id.* On November 16, 1994, Plaintiff's sodium, "BUN," "BUN/Creatinine ratio," cholesterol, and triglycerides were outside the reference range on the results of blood tests. TR 287.

On April 6, 1995, Plaintiff visited Dr. Wells complaining of "tenderness" in his right jaw and sinus drainage, and was diagnosed with pharyngitis. TR 277. On April 10, 1995, Plaintiff complained of "little clear blisters on both hands & both feet [that] burn & itch." *Id.* Dr. Wells diagnosed Plaintiff with "URI" and prescribed an ointment.[9] *Id.* On June 28, 1995, Plaintiff complained of muscle spasms in his neck, shoulders, and upper back that have been recurring "off/on" for approximately "18-20 years since [an] auto accident." TR 276. On December 6, 1995, Dr. Wells noted that Plaintiff's left hand and fingers were "tremulous." *Id.* Plaintiff weighed 164 pounds, and his blood pressure was 130/80. *Id.* On December 13, 1995, Plaintiff reported that his back pain was "better." TR 275.

On January 5, 1996, Plaintiff told Dr. Wells that his back pain was again "better," but

_____

[7] Much of this record is illegible. TR 279.

[8] This date is not fully legible. TR 279.

[9] The ointment name, a second diagnosis, and a second prescription are illegible. TR 277.

6

that his left shoulder "still catches." TR 275. Plaintiff also stated that he had not had a drink since his previous visit on December 13, 1995. *Id.* Dr. Wells diagnosed Plaintiff with gastritis. *Id.* On February 9, 1996, Plaintiff was having "some discomfort" in his left shoulder, but was overall "much better." TR 274. Dr. Wells diagnosed hypertension and a spasm in Plaintiff's left trapezius, and prescribed Calan. *Id.* On March 15, 1996, Dr. Wells recommended decreasing Plaintiff's medication to lessen his fatigue, and noted "no alcohol." *Id.* On March 29, 1996, Plaintiff reported that his blood pressure was "doing great." TR 273. On May 23, 1996, Plaintiff reported elbow and ankle pain, and requested some medications to better control his blood pressure. *Id.* Ankle x-rays revealed "no evidence of fracture." TR 288. Dr. Wells diagnosed hypertension and a right ankle sprain, and prescribed an "ankle immobilizer."[10] TR 273. On June 5, 1996, Plaintiff's ankle pain was "resolved," but his left elbow pain was "worse."[11] TR 272. Dr. Wells opined that that might be as a result of "tendenitis" or "overuse syndrom [*sic*]." *Id.* On July 17, 1996, Plaintiff reported that he wanted to stop taking his medications because they interfered with his sexual drive. TR 271. Plaintiff weighed 162 pounds, and his blood pressure was 110/76. *Id.*

On October 1, 1998, Plaintiff complained to Dr. Wells of swelling and pain in his right knee that radiated down to the middle of his shin. TR 270. Plaintiff also reported stiffness in his hands and fingers, pain in his joints, and increased stress. *Id.* Dr. Wells noted slight edema in the right knee, recommended rest, elevation, and heat, and prescribed Relafen. *Id.* Plaintiff weighed 158 pounds, and his blood pressure was 106/88. *Id.* Plaintiff's blood tests returned normal

_____

[10] Other prescriptions are illegible. TR 273.

[11] The date was not fully copied. TR 272.

7

results. TR 289-290. Plaintiff reported feeling "better" on October 9, 1998. TR 269. Dr. Wells diagnosed Plaintiff with "knee arthritis" and spoke with him about "smoking cessation." *Id.*

On February 26, 1999, Plaintiff visited Dr. Wells complaining that his "hands have been killing him." TR 268. Dr. Wells diagnosed "hand arthritis," and prescribed Celebrex. *Id.* On August 3, 1999, Plaintiff saw Dr. Wells complaining of "aching type pain," knots, and swelling in his right elbow. TR 267. Plaintiff reported that Advil had not helped. *Id.* Dr. Wells prescribed Naprosyn.[12] *Id.* On October 29, 1999, Plaintiff complained of arm and elbow pain, and reported that "Naprosyn helped." TR 266. Plaintiff also reported knee pain. *Id.* Plaintiff weighed 158 pounds, and his blood pressure was 96/64. *Id.* Dr. Wells prescribed Viagra.[13] *Id.*

On July 24, 2000, Plaintiff went to Dr. Wells complaining of numbness and pain in his right arm and hand, shaking in both hands, and increased stress over the preceding three months. TR 265. Dr. Wells diagnosed Plaintiff with problems in his ulnar nerves, an ankle sprain, a rib cyst, and hand warts, recommended ice and exercise for the sprain, and referred Plaintiff to Dr. Rosenthal.[14] *Id.*

On July 28, 2000, Plaintiff saw Dr. Philip Rosenthal "with a five year history of bilateral hand discomfort" and "right worse than left hand problems" that included numbness in his fourth and fifth fingers. TR 140. Plaintiff reported that wrist braces had not helped. *Id.* Dr. Rosenthal noted that Plaintiff's then-current medications were Motrin and Zanaflex. *Id.* Dr. Rosenthal found that Plaintiff's motor strength and "interossious" strength were full, except "between the

---

[12] Dr. Wells's diagnosis is illegible. TR 267.

[13] Dr. Wells's diagnosis is illegible. TR 266.

[14] Ulnar nerve diagnoses specifics and further recommendations are illegible. TR 265.

8

4/5 digits," where strength was "4+/5."[15] TR 141. Dr. Rosenthal found that Plaintiff had "tremors of the upper extremities," and that "even light palpation of the ulnar nerve at the elbows" caused Plaintiff discomfort. *Id.* He noted that a nerve conduction study of Plaintiff's upper extremities revealed only "mild" left carpal tunnel syndrome. TR 140. Dr. Rosenthal diagnosed Plaintiff with "right ulnar nerve entrapment," and recommended "right ulnar nerve decompression and transposition." TR 141. Plaintiff agreed to this surgery. TR 140.

On August 3, 2000, Plaintiff underwent the "right ulnar nerve decompression and transposition" at Summit Medical Center, performed by Dr. Rosenthal. TR 129. Plaintiff's "HGB" and "HCT" were high, while his chloride, carbon dioxide, and "BUN" were below normal range. TR 132-133. A chest x-ray revealed "no acute chest abnormalities," but Dr. Janet E. Evans noted that Plaintiff's "heart size is at the upper limits of normal." TR 135. Dr. Rosenthal listed no complications and noted that Plaintiff "demonstrated excellent movement of all four extremities" after the surgery. TR 129-130. Plaintiff's diagnoses before and after the surgery were both "right ulnar nerve compression at the elbow." TR 129.

On August 11, 2000, Plaintiff saw Dr. Rosenthal for a follow-up regarding his surgery, reporting that he had "a very significant relief of his symptoms in the right hand." TR 139. Plaintiff noted that the "discomfort" in his fourth and fifth fingers "which plagued him prior to surgery is resolved." *Id.* Plaintiff, however, "continue[d] to have similar symptoms now in the left hand." *Id.* Dr. Rosenthal noted that Plaintiff's "sensation is now intact to all five digits on the right," but there continued to be "an ulnar nerve sensory loss on the left." *Id.* Dr. Rosenthal told

---

[15] The date on this record is August 3, 2000, as it is a "Pre-Procedure Assessment." TR 141. The information contained therein, however, relates to the assessment made by Dr. Rosenthal on July 28, 2000. TR 140.

Plaintiff that he could have the left "side repaired in a similar fashion" at any time. *Id.*

On September 21, 2000, Plaintiff returned to Dr. Wells for a follow-up regarding his surgery, complaining of numbness and burning in his wrist and hand. TR 264. Dr. Wells diagnosed Plaintiff with tremors, heightened blood pressure, and problems with the right hand.[16] *Id.* Plaintiff's weighed 155 pounds, and his blood pressure was 150/74. *Id.*

On September 25, 2000, Plaintiff went to the Department of Veterans Affairs, Alvin C. York Campus ("VA"), for "tremors" in "both hands." TR 147. Plaintiff described his pain as "dull ache and numbness in hand." TR 148. Plaintiff's pain was noted to be "moderate" and relieved through medication. *Id.* Plaintiff reported that his pain hindered his mobility and "sometimes" woke him from sleep. TR 149. A functional screening indicated that Plaintiff had no "new problems with mobility" and no "new problems with ADLs." *Id.* The screening also reported that Plaintiff walked frequently and was not limited in his "ability to change and control body position." *Id.* Another test indicated that Plaintiff was at high risk for "developing ulcers." TR 150. Plaintiff's weight was 157 pounds, and his blood pressure was 152/84. TR 147. Plaintiff's history of hypertension, "GI Problems," tobacco use, arthritis, and problems with vision were noted, and his only then-current medication was Viagra. *Id.* Plaintiff said that he had no "barriers/limitations to learning." TR 149. Plaintiff had no errors on a "mental health BOMC, Dementia screen." TR 150. X-rays of Plaintiff's elbows revealed "normal appearing bony structures of the right elbow" and "no obvious abnormality of the soft tissues," except for the appearance of "a small anterior fat pad." TR 155. An x-ray of Plaintiff's chest revealed "some chronic changes" in the left lung "primarily anteriorly," but no appearance of "active pulmonary

---

[16] The specific diagnosis on the right hand is illegible. TR 264.

or cardiac disease." TR 156. Plaintiff was prescribed Chlortrimeton and Motrin. TR 151.[17]

On September 27, 2000, Plaintiff returned to VA with "bronchitis since Monday," as well as pain in his right arm and tremors in both hands. TR 152. An ECG revealed "normal sinus rhythm." TR 157-158. Plaintiff's medications were refilled and he was advised to go on a low salt diet, stop smoking, and "add Maxzide." TR 152. Plaintiff told VA that he did not wish to attend tobacco cessation classes. *Id.* On October 22, 2000, VA noted that Plaintiff "wants a disability claim and was told that he needed to make a couple of sick calls [to] get the ball rolling." TR 144. Plaintiff was diagnosed with right elbow pain, "Rhinitis," and impotence. *Id.*

On October 25, 2000, Plaintiff saw Dr. Wells complaining of numbness in his right arm, and was diagnosed with heightened blood pressure and "benign essential tremors." TR 263. On November 29, 2000, tests for Dr. Wells indicated that Plaintiff's testosterone was in range. TR 291. On December 5, 2000, Dr. Wells diagnosed Plaintiff with erectile dysfunction and right elbow "neuropathy," prescribed Viagra, and instructed Plaintiff to see Drs. Wagner and Rosenthal. TR 262.

On December 11, 2000, Plaintiff went to VA for an appointment, not knowing the appointment was for a tobacco cessation class. TR 145. Plaintiff was "quite upset" about the nature of the appointment, reiterated that he "did NOT want to be referred to the class," and that he did not wish to quit smoking. *Id.*

On February 20, 2001, Dr. Wells "discussed smoking cessation" with Plaintiff. TR 261. Blood tests performed for Dr. Wells on March 5, 2001, returned normal results. TR 292. On May 22, 2001, Plaintiff complained of "sinus drainage" in addition to arm, hand, and joint pain. TR

---

[17] Plaintiff was seen by several nurses and physicians on his visits to VA. TR 142-158.

260. Dr. Wells diagnosed Plaintiff with right ulnar neuropathy and sinusitis.[18] *Id.* Blood tests results were normal, except that Plaintiff's cholesterol was "borderline high." TR 298. On May 29, 2001, Plaintiff had normal sinus rhythms and was in range on all blood chemistry tests. TR 296-297. On August 22, 2001, Plaintiff reported that he was "having trouble with [his] hands." TR 258. Dr. Wells noted a slight tremor in the right hand, and diagnosed Plaintiff with right ulnar neuropathy, tremor, and decreased hearing. *Id.* On October 25, 2001, Plaintiff returned to Dr. Wells complaining of left shoulder pain occurring since a tree fell on him. TR 257. Plaintiff weighed 166 pounds, and his blood pressure was 144/94. *Id.* Dr. Wells recommended that Plaintiff see Dr. Witt. *Id.*

On December 20, 2001, Plaintiff went to Dr. John C. Witt. TR 180-185. Following a physical examination, Dr. Witt diagnosed Plaintiff with "probable left ulnar neuropathy at the elbow," "possible left C7-8 radiculopathy," and "essential tremor." TR 180.

On January 9, 2002, Dr. Witt interpreted "nerve conduction studies" and a "needle exam" done on Plaintiff as indicating "chronic left C8 radiculopathy," a "mild left ulnar neuropathy at the elbow," and "mild left median neuropathy at the [left] wrist." TR 175. Dr. D. Winters performed an MRI of Plaintiff's spine, finding "spinal stenosis with some flattening of the cord... and some narrowing of the neuroforamina," as well as "disc bulging but no definite evidence of disc herniation." TR 189.

On February 20, 2002, Plaintiff visited Dr. Witt stating that a "steroid injection" at the elbow had not helped, and that his arm was now weak to the point that he was having "trouble lifting a jug of milk." TR 173. Dr. Witt prescribed Lortab, increased Plaintiff's prescription for

---

[18] Three other diagnoses and Dr. Wells's recommendations are illegible. TR 260.

12

Neurontin, told Plaintiff to continue taking Vioxx, and increased the "propranolol" to try to better control Plaintiff's blood pressure. *Id.*

On March 19, 2002, Plaintiff saw Dr. Ray W. Hester of Neurosurgical Associates, per Dr. Witt's reference. TR 199. Plaintiff stated that he had been having pain in his neck and left arm, which had worsened "around July, 2001," when a tree fell on him. *Id.* Dr. Hester could find no numbness, but noted indications of grip weakness, "tingling" in Plaintiff's arm, and "muscle tightness." *Id.* An ECG on March 20, 2002, revealed "sinus bradycardia," but was otherwise normal. TR 200. Plaintiff agreed to undergo "ulnar nerve neurolysis." TR 199.

On March 25, 2002, Plaintiff was admitted to St. Thomas Hospital for the "left ulnar neurolysis" surgery, performed by Dr. Hester. TR 161-162. Dr. Hester indicated no surgical complications in the Report of Operation. TR 162. Dr. Hester noted that Plaintiff had "not much change in his fingers at [that] point." TR 198. Plaintiff's diagnoses prior to, and after, surgery were both "left ulnar neuropathy." TR 162. Plaintiff was informed that he could discontinue his usage of Neurontin and Vioxx. TR 198.

On April 16, 2002, Dr. Hester observed that Plaintiff was "doing well" following his surgery. TR 198. Plaintiff continued, however, to have "a little numbness and tingling" in his fourth and fifth fingers on the left side. *Id.*

On May 8, 2002, Plaintiff reported to Dr. Wells that he did not "notice any improvement in numbness [in his left] hand yet."[19] TR 255. Plaintiff weighed 175.5 pounds, and his blood pressure was 130/82. *Id.*

On July 19, 2002, Plaintiff reported to Dr. Witt that his "left ulnar neurolysis" had helped

---

[19] A prescription is illegible. TR 255.

13

relieve the pain, but that he continued to have "persistent numbness" in his fourth and fifth fingers "associated with some hand weakness," as well as "some shoulder pain on the left." TR 172. As a result of Plaintiff's subsiding pain, Dr. Witt instructed Plaintiff to "taper off the Neurontin," but to continue to take Vioxx. *Id.* On July 24, 2002, an MRI of the "left brachial plexus" was normal. TR 188.

On August 8, 2002, Dr. Witt wrote a letter to Dr. D. Michael Barrett, wherein he opined that Plaintiff was "not suitable for work other than sedentary activities." TR 164. Dr. Witt noted that "physical activities involving the [left] arm would need to be extremely light to avoid aggravation of the condition." *Id.*

On September 9, 2002, Dr. Witt completed a Functional Capacities Assessment form regarding Plaintiff. TR 169-170. Dr. Witt opined that Plaintiff had no restrictions on sitting, standing, or walking, and could occasionally lift and carry up to ten pounds. TR 169. Dr. Witt believed that Plaintiff had no restrictions in the use of his right hand, but was occasionally limited in "simple grasping" and "fine manipulation" in his left hand. *Id.* Dr. Witt stated that Plaintiff could use his feet for repetitive movement and was able to balance. *Id.* Dr. Witt opined that Plaintiff could frequently bend and squat, but could only occasionally twist, and could never crawl, climb, and "work/reach above shoulder." TR 170. Dr. Witt found Plaintiff's only environmental limitation to be vibration. *Id.* Dr. Witt warned that his treatments for Plaintiff might cause "sedation" and "fatigue." *Id.*

On September 10, 2002, Plaintiff went to Dr. Hester complaining that he still had "some tingling and numbness in the little finger of his left hand." TR 198. Plaintiff also reported "tightness and some muscle spasm" sporadically around his left shoulder. *Id.* Dr. Hester opined

14

that, although Plaintiff would have "difficulty doing heavy work in the future," he was "not disabled to the point that he can't do light activity." *Id.* Plaintiff's left and right hand grip strength were 30 and 65, respectively, which did "not seem to be changed much since his operation." TR 193, 198.

On September 12, 2002, Dr. Wells diagnosed Plaintiff with hypertension, "neck/shoulder pain," "SAR," a "benign essential tremor," erectile dysfunction, and "tachycardio." TR 254. Dr. Wells also noted that Plaintiff did not wish to quit smoking. *Id.*

On October 15, 2002, Plaintiff returned to Dr. Hester with the same complaints as on September 10, 2002. TR 197. Dr. Hester diagnosed Plaintiff with "spondylosis" and "some stenosis at both 4-5 and 6-7 that is mild." *Id.* Dr. Hester noted that Plaintiff's "degenerative disease in the neck, bulging discs, and associated pain and weakness" were "significant," but that Plaintiff was not "an operative candidate." *Id.*

On October 28, 2002, Plaintiff went to VA with complaints of "a gradual decline in his hearing." TR 143. Plaintiff had "bilateral" "recurrent" "tinnitus" with "no single caustive [*sic*] factor." *Id.* Tests revealed "the presence of a mild cochlear hearing deficit, AU." TR 146. The examiner did not recommend follow-up, considering Plaintiff's hearing problems to be "a singular abnormality that [did] not... warrant[] any further medical evaluation." TR 143, 146.

On December 5, 2002, Dr. Miller completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff.[20] TR 201-208. Dr. Miller believed that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours in an eight-hour period, and sit about six hours in an eight-hour period. TR 202. Dr. Miller noted

---

[20] The physician's full name is illegible. TR 208.

that Plaintiff had no postural, visual, communicative, or environmental limitations. TR 203-205.

Dr. Miller also found, however, that Plaintiff was frequently limited in his upper extremities on

the left side, specifically with respect to handling and fingering. TR 202, 204.

On January 22, 2003, Plaintiff complained to Dr. Wells of side effects of "propranolol,"

including impotence, dry skin, and diarrhea, and also complained of rectal bleeding and

insomnia. TR 253. Dr. Wells diagnosed Plaintiff with hypertension, "BRBPR," insomnia, and

"SSR," switching two of his medications.[21] *Id.* Plaintiff weighed 161 pounds, and his blood

pressure was 154/94. *Id.*

On February 24, 2003, Plaintiff returned to Dr. Wells complaining of "burning in outer

lower legs," warts on his hands and genitals, depression, hypertension, and a desire to stop

drinking alcohol. TR 250. Dr. Wells noted that Plaintiff's hypertension and burning in legs

"remain[ed] inadequately controlled." *Id.* Dr. Wells believed that Plaintiff's warts and tingling

were "related to alcohol." TR 252. A review of Plaintiff's systems was notable for high blood

pressure, acid reflux, joint pain, pain and stiffness in the neck, and depression. TR 250-251. Dr.

Wells diagnosed Plaintiff with "benign essential hypertension," "bilateral lower extremity

paresthesias," abuse of alcohol, and "condyloma accuminata." TR 252. Plaintiff's medications

included Prevacid, Viagra, Vioxx, Verapamil, Nasacort, and Lisinopril. *Id.*

On March 4, 2003, Plaintiff went to VA stating that he wanted to "detox" and that his last

beer had been that morning "for the shakes." TR 146. Plaintiff reported that he had drunk at least

twelve beers per day "for a number of years," and that he had been experiencing withdrawal

symptoms. TR 212, 218. Plaintiff denied delirium tremors, but "when he would start feeling

---

[21] The names of the medications are illegible. TR 253.

16

shaky he would get some more beer." TR 212. Plaintiff also denied seizures, but reported that he

has had "a blackout." *Id.* Plaintiff stated that he did "not know about sleep," as he typically drank

"until he passe[d] out." *Id.* Plaintiff had symptoms of "motor tension," "autonomic

hyperactivity," and "hypervigelence," as well as "excessive/persistent daily worry about life

circumstances that has no factual or logical basis," problems with "falling and staying asleep,"

and "irritability." *Id.* Plaintiff stated, however, that he usually felt rested after sleep. TR 217.

Plaintiff reported that his "anti-anxiety [prescription] medications" were effective. TR 212. It

was noted that Plaintiff had physical, mental, and attendant circumstance symptoms of substance

abuse. TR 213. Plaintiff denied "wanting to harm himself or others." TR 215. Although Plaintiff

was "appropriate and pleasant," he stated that he was depressed. *Id.* Plaintiff's appetite was

"fair," though his hands were "shaking so that it [was] difficult for him to feed himself." *Id.*

Plaintiff denied abuse of anything other than alcohol. TR 219. Plaintiff reported that the pain in

his arms and hands was "satisfactorily controlled." *Id.* Plaintiff was noted to be "anxious" and

have "poor" judgment and concentration. *Id.* Plaintiff stated that he had been "threatened, hit,

kicked, slapped, forced to engage in sexual activities, or otherwise physically abused" before.

TR 220. Plaintiff was not then at risk of developing ulcers. TR 222. Except for "decreased

sensation" in the fourth and fifth fingers of the left hand and "occult blood" in his stool,

Plaintiff's physical examination was normal. TR 225-226.

 From March 4 through March 14, 2003, Plaintiff stayed at VA for detoxification and

substance abuse treatment. TR 210. On March 5, 2003, Plaintiff was "resting quietly without any

difficulties noted" and interacting with others in the hospital. TR 226. Plaintiff was noted to have

"no other psychiatric illnesses." TR 227. Plaintiff's examiner listed Plaintiff's then-current GAF

at 45, with the highest in the past year being 65. TR 228. The examiner noted Plaintiff's compliance and desire to cooperate with treatment. *Id.* On March 6, 2003, Plaintiff complained of withdrawal symptoms, and it was noted that Plaintiff's detoxification would "have to be taken slowly." TR 229. Plaintiff reported a pain level of five in both forearms. *Id.* Plaintiff stated that his pain was sporadic and averaged a four, but could reach ten on a scale of one-to-ten. TR 231. Plaintiff was noted to be "cooperative and compliant," with "slight tremors." TR 232. On March 7, 2003, Plaintiff was cooperative and compliant, but he denied pain, and had "little interaction with peers or staff." *Id.* On March 8, 2003, Plaintiff complained of pain in his "left shoulder and neck" at a level of seven and was given Tylenol. TR 233. On March 9, 2003, Plaintiff reported that the Tylenol had not been effective for his pain, and he opined that Celebrex would probably treat his arthritis better than Vioxx. TR 234. On March 10, 2003, Plaintiff was "red faced" and complained of arthritis pain at a level of eight in his shoulders, hands, and joints. TR 235. Plaintiff was noted to be "much improved." *Id.* On March 11, 2003, Plaintiff was interacting with other patients and cooperating with staff. TR 237. On March 12, 2003, Plaintiff complained of pain at a level of eight in his joints, neck, and back, but was "having no further signs of withdrawal." TR 239. On March 13, 2003, Plaintiff's medication was changed to "propanalol" to try to control the non-alcohol related aspects of his "noticeable" tremor, "a years-long condition." TR 241. Plaintiff's then-current GAF was 70. TR 242.

On March 14, 2003, Plaintiff was discharged from VA in a "cheerful" mood. TR 245. It was noted that, although Plaintiff's tremor remained, it was "much improved from the shaking he had when he came in to the hospital." TR 210. Plaintiff's face was still red, but had "paled a bit." *Id.* The results of tests performed during his stay were "within normal limits." *Id.* Plaintiff's

discharge medications included Ranitidine and Baclofen, and Plaintiff was instructed to take a multivitamin. TR 210-211. Plaintiff's "final diagnosis" was alcohol and nicotine addiction, "repetitive motion injury of both arms," a flushed face, tremor, osteoarthritis, and "gastroesophageal reflux disease." TR 211.

On March 25, 2003, Plaintiff followed-up with Dr. Wells. TR 247-249. Dr. Wells noted that Plaintiff's arthritis, "GERD," hypertension, and sinusitis were all "well-controlled." TR 247. Plaintiff complained of sleeping problems, joint stiffness in the knees, and "a resting tremor." *Id.* A review of Plaintiff's systems was notable for high blood pressure, acid reflux, joint pain, stiffness, pain in the neck, and depression. *Id.* Dr. Wells diagnosed Plaintiff with "acute sinusitis, unspecified," "benign essential hypertension," "esophageal reflux," and dependency on alcohol. TR 248. Dr. Wells referred Plaintiff to a psychiatrist. *Id.*

### B.  Plaintiff's Testimony

Plaintiff was born on March 24, 1957, and has a high school diploma.  TR 322. Plaintiff had received some vocational training in mechanical work. *Id.*

Plaintiff testified that he had last worked "early in 2000," handling "shipping and receiving" for a "tractor supply" company. TR 322. Plaintiff stated that he had "had to quit" that job after two months because he "couldn't do the work." *Id.* Plaintiff reported that, prior to the tractor supply company, he had worked at "Specialty Converting" for just over one year as a "machine operator." TR 323. Plaintiff testified that he had also quit that job because he could not do the work. *Id.* Plaintiff stated that he had worked for "approximately 15 years" at DeKalb Telephone Cooperative as "their fleet truck mechanic." *Id.* Plaintiff reported that he had to lift objects weighing more than 100 pounds while working at DeKalb. *Id.* Plaintiff testified that he

had had no supervisory responsibilities at DeKalb. *Id.*

Plaintiff reported that his "principal problems" were "numbness, trembles," weakness, and loss of dexterity in his "hands and arms." TR 324. Plaintiff testified that "doctors told [him] that [his shaking hands] might be an after affect [*sic*] of the surgeries" on his arms. TR 327. Plaintiff stated that he took Feldene, Pemodone, Paxil, Verapamil, and Protonix for his problems. TR 324. Plaintiff testified that his medications sometimes caused him to be "down and out." TR 325. Plaintiff reported that he had undergone surgery "to alter nerves in both arms," and that, although it had "helped a little bit," it "didn't cure the whole problem." *Id.* Plaintiff stated that his arm pain was "about 7" on a ten-point scale when he did not take his medication. TR 327. Plaintiff reported that the pain was "down to a tolerable level" and was a "3 or 4 maybe" when taking his medication. *Id.* Plaintiff stated that when he tried to use his hands, they would "start to cramp up" and "go to drawing up." *Id.* Plaintiff added that that would last for more than "just a few minutes" and he would "have to go sit down" because he could not "do nothing [*sic*]." *Id.* Plaintiff testified that he also had degenerative disk disease, as well as losses in hearing and memory. TR 325. Plaintiff stated that he had not "had a drop" of alcohol since his two weeks of detoxification at VA in November, 2004. TR 326-327, 328. Plaintiff testified that he had "been hospitalized previously for alcohol drinking," and that, prior to the hospital stay he testified to, he would drink "about a 12 pack of beer a day, maybe better than that." TR 329. Plaintiff reported that he smoked "about a pack [of cigarettes] a day." *Id.*

Plaintiff opined that he could match the contents of a box of bolts to those of a box of nuts, but "it'd probably end up being an all day job." TR 328. Plaintiff further opined that he probably could not put the emptied contents of a box of toothpicks back into the box. *Id.* Plaintiff

reported that he had "trouble [lifting] a fresh gallon of milk." TR 329. Plaintiff testified that he

"sometimes" had trouble sitting because of his back pain, and he would have to "move around or

go lay down." *Id.* Plaintiff believed that he could sit for "like an hour" and stand for an "hour or

two maybe, but that's about it." *Id.* Plaintiff reported that his legs were fine, and he had no

trouble walking. TR 330.

Plaintiff testified that, on a typical day, he would take his medication when he woke up,

but then drowsiness from the medication would put him back to sleep until early afternoon. TR

326. Plaintiff reported that, in the afternoon, he "might get up and walk around outside on a nice

day." *Id.* Plaintiff testified that he did not "get out and do much stuff anymore." *Id.* Plaintiff

stated that he had not driven in "about three or four years." TR 325. Plaintiff testified that he did

not drive because he did not "have a vehicle to drive right now." TR 328. Plaintiff reported that

"friends, neighbors, [and] relatives" took him to doctors' appointments, the drug store, and the

grocery store. TR 326. Plaintiff testified that a friend also did his housework. *Id.* Plaintiff

reported that he did "not really" have any hobbies, but that he saw his "sons, friends, relatives"

on a regular basis "that live[d] close by within walking distance." TR 330. Plaintiff stated that he

did not do any outdoor activities. TR 326. Plaintiff reported that he could "pretty much take care

of [his] personal grooming needs." *Id.*

## C.  Witness Testimony

Charles "Bridge" Barrett also testified at Plaintiff's hearing. TR 330-332. Mr. Barrett

testified that he was Plaintiff's next-door neighbor, had "known him about 13 years," and had

"known him real good for the last probably five years." TR 330-331. Mr. Barrett added that he

saw Plaintiff two or three times per week. TR 331.

Mr. Barrett testified that Plaintiff no longer gardened. TR 331. Mr. Barrett reported that he knew about Plaintiff's problems partly from hearing Plaintiff discuss them. *Id.* Mr. Barrett stated that he had seen Plaintiff have problems with his hands, including tremors. *Id.* Mr. Barrett testified that Plaintiff's attorney was his son, but that that would "absolutely not" alter his testimony. TR 332.

### D. Vocational Testimony

Vocational expert ("VE") Dr. Gordon Doss also testified at Plaintiff's hearing. TR 332-337. The VE testified that Plaintiff's past work "as a forklift operator" at the tractor supply company could be classified as medium and semi-skilled, his past work at Specialty Converting as heavy and unskilled, and his past work as a truck mechanic as heavy and skilled. TR 333.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, given a finding that Plaintiff could "perform a full range of light work," and asked if the hypothetical claimant would be able to find work. TR 333. The VE answered that the hypothetical claimant could work mainly at "unskilled, skilled entry-level jobs, because of the prior experience." *Id.* The VE opined that, in the State of Tennessee, there were approximately 1,047 light counter clerk positions, 1,388 unskilled security guard positions, and 1,594 non-postal service mail clerk positions, all of which would be appropriate for the hypothetical claimant. *Id.*

The ALJ then modified the hypothetical to include a restriction against "heavy lifting or grasping with his left hand." TR 334. The VE testified that such a restriction "wouldn't have any significant impact on the jobs that [he] listed." *Id.*

The ALJ again modified the hypothetical to include a claimant who could "not perform jobs requiring repetitive lifting, gripping or grasping with either hand." TR 334. The VE testified

that "the only job that [he] would rule out of those that [he] listed would be the mail clerk job." *Id.* The VE further testified that "other jobs in the light category" that could be performed by the hypothetical claimant would be as a parking lot attendant, order filler, and receptionist or information clerk. *Id.* The VE stated that, in the State of Tennessee, there were approximately 446, 4,516, and 1,698 of those jobs, respectively, all of which would be appropriate for the hypothetical claimant. TR 334-335.

Plaintiff's attorney presented the VE with a hypothetical situation paralleling that of Plaintiff, adding Plaintiff's testimony that sorting nuts and bolts would be an all-day job, and asked if that would limit the availability of positions to which the VE had previously testified. TR 335. The VE testified that it would limit the available counter clerk jobs to those at businesses that did not get very busy, would "rule that [mail clerk] job out altogether," and would not affect the availability of security guard jobs. TR 335-336. The VE further testified that receptionist or information clerk jobs would not be limited, the order filler jobs could be limited "depending on the degree to which the hands are limited," and the parking lot attendant jobs could be limited if Plaintiff "was unable to handle coins and bills." TR 336.

Plaintiff's attorney then modified the hypothetical to include Plaintiff's testimony as to his "non-exertional problems of being drowsy and having memory loss." TR 336. The VE testified that if those problems were "either mild or even moderate level on a persistent basis," the only jobs he had previously listed "that might be ruled out would be being around hazardous machinery or driving." TR 337. The VE stated, however, that if those problems were "the moderate severe marked level on a consistent basis," then, "by definition" Plaintiff "would not be expected to be able to work or perform sustained work. *Id.*

23

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

Case 3:05-cv-00952   Document 22   Filed 07/16/07   Page 24 of 39 PageID #: 80

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[22] or its equivalent. If a listing is met or

---

[22] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the

claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in (1) finding that Plaintiff could "perform a significant range of light work," (2) applying the grid despite Plaintiff's nonexertional limitations, and (3) disregarding Plaintiff's alcoholism. Docket Entry No. 17. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or, in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

### 1. Plaintiff's Ability to Perform Light Work

Plaintiff argues that, in finding that Plaintiff could "perform a significant range of light

27

work," the ALJ improperly disregarded medical evidence, most notably the opinion of treating physician Dr. Witt. Docket Entry No. 17. Specifically, Plaintiff argues that the ALJ refused to accept Dr. Witt's opinion regarding Plaintiff's inability to work, and Dr. Witt's opinion that Plaintiff could "only occasionally lift or carry ten pounds and never crawl, climb, work above his shoulder or work with vibration." *Id.*, p. 4. Plaintiff further maintains that the ALJ failed to review Dr. Witt's opinion regarding the effects of the prescription medications upon Plaintiff. *Id.* Plaintiff also argues that the ALJ "failed to note" Dr. Witt's opinion that Plaintiff could never engage in pushing or pulling with the left hand and could only occasionally engage in simple grasping or fine manipulation with the left hand. *Id.*

With respect to the opinions of other physicians, Plaintiff contends that the ALJ "failed to consider" Dr. Wells' February 24, 2003 recommendation for alcohol detoxification and diagnosis of bilateral lower extremity paresthesias and alcohol abuse. Docket Entry No. 17, p. 4. Plaintiff additionally maintains that the ALJ did not consider VA physician Dr. Watkins' opinion that Plaintiff had "drunk steadily, daily for years," that he was "disabled from repetitive motion injury of both arms," and that he was "an ill-looking man, very red in the face, with coarse tremor of both hands and voice." *Id.*, p. 5. Finally, Plaintiff contends that the ALJ was not afforded the opportunity to review VA neurologist Dr. Salekin's opinion that Plaintiff was "not suitable for any gainful employment" because he was suffering from "tremors, pain in both hands from carpal tunnel syndrome," "low back pain and neck pain, high blood pressure, depression, [and] arthritis." *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

28

Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

...

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

29

20 C.F.R. § 404.1502.

In the case at bar, Dr. Witt was one of Plaintiff's treating physicians, a fact that would justify the ALJ according greater weight to his opinion than to other opinions, as long as his opinion was not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d). The ALJ in the instant case noted that Dr. Witt's assessment of Plaintiff's limitations contradicted not only much of the medical evidence in the record, but also his own treatment records. TR 17. Specifically, the ALJ noted that Dr. Witt's assessment was contrary to Plaintiff's "very significant" improvement reported to both Dr. Rosenthal and to Dr. Hester, as well as to his own treatment notes opining that Plaintiff had "only mild root impingement." *Id.*

Although Plaintiff is correct that the ALJ did not directly address Dr. Witt's opinion with regards to the side effects of Plaintiff's prescription medications, the ALJ noted Plaintiff's report to Dr. Rosenthal that his prescription for Atenolol had no side effects, and he refrained from using the grid to direct a conclusion because he determined that Plaintiff had "additional exertional and/or non-exertional limitations" that needed to be considered.[23] TR 17, 19.

Plaintiff also asserts that the ALJ "failed to note" Dr. Witt's opinion that Plaintiff could never engage in pushing or pulling with the left hand and could only occasionally engage in simple grasping or fine manipulation with the left hand. *Id.* Although the ALJ did not specifically mention Dr. Witt by name, the ALJ ultimately found that Plaintiff was "unable to perform repetitive lifting, gripping or grasping with his left hand." TR 17.

Contrary to Plaintiff's assertions that the ALJ "failed to consider" Dr. Wells' February

---

[23] "Additional exertional and/or non-exertional limitations," by definition, include reported side effects of medication.

24, 2003 recommendation for alcohol detoxification and diagnosis of bilateral lower extremity parenthesis and alcohol abuse, the ALJ expressly noted it. TR 16. The ALJ also noted that Plaintiff had entered alcohol detoxification at VA a week later, leaving the program after ten days "with a plan to stay sober." *Id.* Additionally, the ALJ noted Plaintiff's testimony that his alcohol abuse was in remission, and that he could walk to visit friends and relatives. TR 17. Finally, the ALJ noted that Plaintiff had returned to Dr. Wells one month later complaining of stiffness in his knees. TR 16. Dr. Wells, however, did not repeat a diagnosis of bilateral lower extremity paresthesias at that time. *Id.*

Plaintiff is correct that the ALJ did not expressly mention the opinion of VA physician Dr. Watkins that Plaintiff had "drunk steadily, daily for years," that Plaintiff was "disabled from repetitive motion injury of both arms," and that Plaintiff was "an ill-looking man, very red in the face, with coarse tremor of both hands and voice," but Dr. Watkins made these observations during the first two days of Plaintiff's alcohol detoxification at VA. *See* TR 227-228. Instead of unnecessarily discussing each day of Plaintiff's treatment, the ALJ recognized that Plaintiff was in a detoxification program, and noted that Plaintiff had left that detoxification period with an "improved" tremor and "with a plan to stay sober." TR 16.

Plaintiff is also correct in his assertion that the ALJ "was not afforded the opportunity to review" the opinion of Dr. Salekin. Docket Entry No. 10, p. 5. Dr. Salekin's assessment was not part of the record at the time of the hearing. Plaintiff has filed a "Motion for Remand for Consideration of New Medical Evidence" with regard to a "medical report" submitted by Dr. Salekin. Docket Entry No. 18. That Motion will be addressed below.

The ALJ properly evaluated the evidence of record and reached a reasoned decision.

31

Substantial evidence supports the ALJ's conclusion that Plaintiff retained a Residual Functional Capacity for Light Work; that decision must stand.

## 2. Use of the Grid With Nonexertional Limitations

Plaintiff contends that "rote application of the grid is inappropriate" in the case at bar because Plaintiff had nonexertional limitations. Docket Entry No. 17. Specifically, Plaintiff maintains that he suffered from the following nonexertional impairments: (1) an unmedicated pain level of seven on a scale of one-to-ten, (2) prescription medications that caused him to "forget things all the time," and "on occasion put him 'down and out' after breakfast," (3) prescription medications that caused "sedation, fatigue," and (4) alcohol addiction. *Id.*, p. 6. Although Plaintiff correctly asserts that the grid rules cannot be used to preclude a finding of disabled in the presence of nonexertional limitations, Plaintiff is incorrect in stating that the ALJ employed "rote application of the grid."

As an initial matter, Plaintiff's assertions with regard to his pain level are supported solely by his testimony; his assertions with regard to the side effects of his prescription medications are supported by his testimony and the opinion of Dr. Witt; and his assertions with regard to his alcohol addiction are supported by his own testimony and the opinion of Dr. Watkins.

As discussed above, the ALJ was unable to accept the opinions of Dr. Witt, as they were inconsistent with his own treatment notes and with other substantial evidence of record. TR 17. As further discussed above, the opinions expressed by Dr. Watkins during Plaintiff's first and second day of detoxification are inapposite as Plaintiff successfully completed ten days of detoxification, and left "improved" and "with a plan to stay sober." TR 16. As to Plaintiff's

Case 3:05-cv-00952   Document 22   Filed 07/16/07   Page 32 of 39 PageID #: 88

testimony, the ALJ appropriately found that Plaintiff was not fully credible. TR 17. Specifically, the ALJ noted inconsistencies not only within Plaintiff's own testimony, but between Plaintiff's testimony and the objective medical evidence of record. *Id.* The ALJ noted that Plaintiff had testified that he had gotten worse to the extent that he had trouble lifting a gallon of milk, but had also testified that "ulnar surgery did help his condition." *Id.* The ALJ also noted that Plaintiff's reports of "very significant" post-surgical improvement to Dr. Rosenthal and Dr. Hester were inconsistent with his testimony. *Id.* The ALJ additionally noted Dr. Hester's belief that Plaintiff could "return to regular activities" following surgery on his left side, and Dr. Miller's assessment of Plaintiff's physical residual functional capacity. *Id.*

As explained above, the Commissioner has the burden at step five of establishing the claimant's ability to work by proving the existence of a significant number of jobs in the national economy that the claimant could perform, given his or her age, experience, education, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920. *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The Commissioner's burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not significantly limited by nonexertional impairments, such as mental limitations, manipulative limitations or environmental limitations. *Abbot v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).

Because the ALJ correctly found the existence of nonexertional impairments, the ALJ used the grid only "as a framework" for his decision. TR 18-19. The ALJ, in fact, noted that the grid would only "direct[]" an unfavorable decision "if the claimant were capable of performing the *full range* of light work." TR 19. (Emphasis added.) The ALJ found only that Plaintiff had the residual functional capacity to perform "a significant range" of light work. TR 20. The ALJ

33

stated that, because Plaintiff's "ability to perform... all of the requirements of light work is impeded by additional exertional and/or non-exertional limitations," he used the testimony of the VE to determine whether "there are a significant number of jobs in the national economy that [Plaintiff] can perform." TR 19. The ALJ found the VE credible, and the VE noted the existence of a significant number of jobs in the national economy that would be appropriate for Plaintiff to perform, given his exertional and nonexertional impairments.

The ALJ appropriately made credibility determinations, considered the evidence he deemed credible, and properly progressed through the requisite five-step sequential evaluation process. Despite Plaintiff's assertions, the ALJ did not blindly apply the grid. Because the VE identified a significant number of jobs in the national economy that would be appropriate for Plaintiff, the ALJ's decision was supported by substantial evidence and must stand.

### 3. Plaintiff's Alcoholism as a Basis of Disability

Plaintiff essentially argues that the ALJ made no finding with respect to whether Plaintiff's alcoholism entitled him to a closed period of disability benefits and that, accordingly, the ALJ's decision that Plaintiff was not disabled "as defined in the Social Security Act" is not supported by substantial evidence and must be remanded. Docket Entry No. 17.

Plaintiff cites non-binding cases from the Eighth Circuit and the Fourth Circuit as support for his proposition that "the Secretary must make a specific finding on [Plaintiff's] ability to control his drinking and its disabling effect" when there is evidence of alcohol abuse. Docket Entry No. 17. Neither case, however, makes that assertion. In *Orr v. Heckler*, the Eighth Circuit remanded because the ALJ did not properly inquire into the claimant's history of alcoholism and its effects, not because the ALJ did not make a finding with regard to the claimant's alcoholism.

34

737 F.2d 770, 771 (1984). The ALJ in the case at bar heard testimony with regard to Plaintiff's alcoholism, some of it in response to questions posed directly by the ALJ. TR 326-327, 328-329. In *Gordon v. Schweiker*, the Fourth Circuit vacated and remanded because the ALJ did not indicate the weight he gave to various pieces of medical evidence in the record, not because the ALJ did not make a finding with regards to the claimant's alcoholism. 725 F.2d 231, 236 (1984). That Court, in "provid[ing] some guidance," noted that the ALJ "must inquire whether the claimant is addicted to alcohol and has lost the ability to control its use." *Id.* Suggestive dicta from a non-binding court, however, is hardly cause to remand the case at bar.

With regard to whether a finding must be made as to a claimant's alcoholism, the Code of Federal Regulations states:

> (a) *General.* If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability...

20 C.F.R. § 416.935(a).

The ALJ only briefly mentioned Plaintiff's efforts at alcohol detoxification (TR 16) and was completely silent on the subject in his analysis and findings (TR 16-21). Plaintiff, therefore, is correct that the ALJ "did not consider whether [Plaintiff] was entitled to a closed period of disability due to his alcoholism." Docket Entry No. 10, p. 6. In the case at bar, however, the ALJ determined that Plaintiff was not disabled. TR 21. Because there was no determination of disability, the Regulations do not require the ALJ to further address Plaintiff's alcoholism. 20 C.F.R. § 416.935(a). Plaintiff's argument, therefore, fails.

### D.  Plaintiff's "Motion For Remand For Consideration of New Medical Evidence"

Also pending before the Court is Plaintiff's "Motion For Remand For Consideration of

New Medical Evidence." Docket Entry No. 18. Plaintiff has attached to that Motion, a "medical report" from Plaintiff's VA neurologist, Dr. C.M. Salekin, that he asks the Court to consider as new and material evidence to support remand pursuant to Sentence Six of 42 U.S.C. § 405(g).

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new, material evidence is available; and (2) there is good cause for the failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

Plaintiff's "new, material evidence" is a "medical report" dated December 1, 2005, from Dr. Salekin that states in its entirety:

> To Whom It May Concern
> James Entrekin was seen by me today in my Neurology Clinic for Tremors, pain in both hands from Carpal Tunnel Syndrome. He has low back pain and neck pain, High blood pressure, Depression, [and] Arthritis.
>
> With his current active medical problems I believe he is not suitable for any gainful employment. If you have any further question[s], please do not hesitate to contact me.

Docket Entry No. 18, attachment.

Plaintiff must first establish that the document is "new." Plaintiff's hearing was conducted on December 22, 2004. TR 319-338. Dr. Salekin's "medical report" is dated December 1, 2005, nearly one year after Plaintiff's hearing. Docket Entry No. 18, attachment. Dr. Salekin's "medical report" is a letter to which no supporting medical records were attached. Although Plaintiff, in his "Motion for Remand For Consideration of New Medical Evidence," asserts that Dr. Salekin was Plaintiff's VA "treating neurologist," the record does not contain treatment records from Dr. Salekin indicating the time period in which he treated Plaintiff.

36

Accordingly, while the letter itself is "new" in that in was written after Plaintiff's hearing, Plaintiff has not submitted any evidence demonstrating that the opinions expressed therein were based upon treatment that occurred post-hearing.

Significantly, Plaintiff cannot establish that Dr. Salekin's "medical report" is material. "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Plaintiff has failed to satisfy this burden. The regulations state that more weight will be given to medical opinions supported by "relevant evidence... particularly medical signs and laboratory findings." 20 C.F.R. §§ 416.927(d)(3) and 404.1527(d)(3). As noted above, the "medical record" Plaintiff offers for consideration is merely a letter written by Dr. Salekin, supported by no medical records, test results, or other relevant evidence. Docket Entry No. 18. Additionally, as has been discussed, the record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which constitute "substantial evidence" to support the ALJ's conclusion. Specifically, the ALJ noted, *inter alia*, evidence that demonstrated that Plaintiff's tremors had "improved" with treatment and restraint from alcohol abuse, his arthritis could be "well-controlled," surgery had improved both of Plaintiff's hands so that only "numbness" and/or "tingling" remained, a cervical MRI revealed only "mild disc bulge [and] root impingement," and he had "full range of motion" in his neck. TR 15-17. Furthermore, although the ALJ found that Plaintiff's "left C8 radiculopathy and essential tremor" were "severe" within the meaning of the regulations (TR 16), this did not alter the ALJ's

37

determination that Plaintiff "retain[ed] the ability to perform some work," which, as noted above, was supported by substantial evidence.

Even if Dr. Salekin's "medical record" had been part of the record before the ALJ, "substantial evidence" supports the ALJ's findings and inferences. The ALJ's decision demonstrates that he carefully considered the testimony of Plaintiff, Plaintiff's neighbor Mr. Barrett, and Vocational Expert, Dr. Doss; observed Plaintiff during his hearing; assessed the medical records; and reached a reasoned decision. Thus, there is no "reasonable probability that the Secretary would have reached a different disposition of the disability claim" if Dr. Salekin's "medical record" had been part of the record before the ALJ.

Moreover, Plaintiff has not established "good cause" for failing to submit this evidence to the ALJ during the hearing. Plaintiff argues that "language barriers" between himself and Dr. Salekin prevented him from effectively conveying his need for disability documentation prior to December 1, 2005. Docket Entry No. 18. Plaintiff additionally maintains that he was evicted from his home and misplaced this "neurologist report." *Id.* Finally, Plaintiff states that he "knew of no way to furnish this documentation to the Social Security Administration or this Honorable Court until now." *Id.* Plaintiff previously had been able to convey the need for disability documentation, despite any language barriers (*see* TR 142), and he offers no evidence demonstrating why he suddenly was unable to do so. Additionally, Plaintiff had the knowledge allowing him to be able to request, receive, and "furnish... documentation to the Social Security Administration or this Honorable Court" to be entered into the record on previous occasions (*see* TR 142), and Plaintiff gives no evidence demonstrating why he suddenly lacked this knowledge. Finally, Plaintiff's eviction is unfortunate, but Plaintiff's own act of misplacement is not good

cause for failing to file this "neurologist report."

Plaintiff has failed to demonstrate either that the new evidence was material or that there was good cause for his failure to present the new evidence at the administrative hearing. Accordingly, remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is not warranted.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED. The undersigned further recommends that Plaintiff's "Motion For Remand For Consideration of New Medical Evidence" likewise be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:05-cv-00952   Document 22   Filed 07/16/07   Page 39 of 39 PageID #: 95